Bryan S. BEHRENS, Plaintiff,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, et al., Defendants.

No. 8:CV 92–00697.

United States District Court,
D. Nebraska.

May 14, 1993.

John C. Lindsay, Lindsay & Lindsay, Omaha, NE, for plaintiff.

Roger J. Miller, McGrath, North, Mullin & Kratz, Omaha, NE, Charles I. Cohen, Elizabeth I. Torphy–Donzella Ogletree, Deakins, Nash, Smoak & Stewart, Washington, DC, for defendants.

**MEMORANDUM AND ORDER**

KOPF, District Judge.

This matter is before the court on the defendants' motion for summary judgment. (Filing 3). In support of their motion, defendants have submitted briefs as well as various affidavits with supporting documentary exhibits (Filings 9 and 10). Plaintiff has filed a brief in opposition to the motion as well as his own affidavit (Filing 6). For the reasons more fully discussed below, the defendants' motion will be granted in part, and held in abeyance in part.

## I. Background

### a. The Parties

Plaintiff was employed by defendant John Hancock Mutual Life Insurance Company ("John Hancock") from January 1, 1984, until August of 1988. (Filing 9, Affidavit of Paul M. Heaslip at ¶ 7; Filing 1, Complaint at ¶ 12). Defendant John Hancock Variable Life Insurance Company ("Variable") is a wholly-owned subsidiary of John Hancock, through which variable life insurance products are sold. (Id. at ¶ 3). When a Marketing Representative terminates or has his employment with John Hancock terminated for any reasons, his authority to market products of Variable is automatically terminated as well. (Id. at ¶ 5).

Defendant John Hancock Distributors, Inc. ("Distributors") is in the business of marketing investment products such as mutual funds and other securities, and is a registered broker dealer with the National Association of Securities Dealers ("NASD").[1] (Filing 9, Buckley Affidavit at ¶ 2). Distributors does not, however, sell insurance products. (Id. at ¶ 3).

Distributors utilizes the services of independent contractors, called Registered Representatives or Sales Representatives, to market its investment products. The independent contractors are required to register with the NASD as a precondition to becoming a Distributors' representative. (Id. at ¶ 4).

John Hancock is a parent company of Distributors (Id. at ¶ 5), and Distributors uses John Hancock Marketing Representatives as the "core group" of its independent contractors. (Id. at ¶ 6). Once an individual is hired by John Hancock, he is eligible, upon registration with the NASD, to become a Registered Representative of Distributors also. As it is with Variable, if a John Hancock Marketing Representative terminates or has his employment with John Hancock terminated for any reason, his relationship with Distributors is automatically terminated as well. (Id. at ¶ 7).

From 1984 until October 19, 1987, plaintiff was employed as a Marketing Representative for John Hancock. (Filing 9, Heaslip Affidavit at ¶ 7). On October 19, 1987, he was promoted to Staff Manager, which is a supervisory position. (Id.) On June 13, 1988, he returned to his position as a Marketing Representative, where he remained for the remaining months of his employment. (Id.)

During the time that plaintiff was employed as a Marketing Representative for John Hancock, he was a member of the collective bargaining unit.[2] The collective bargaining agreement which covers John Hancock Marketing Representatives also covers those representatives when they sell products of Variable. (Id. at ¶ 4). Both parties agree that for that period of time when he was employed as a Staff Manager, he was not a member of the collective bargaining unit. (Behrens' Affidavit, Filing 6 at ¶ 2; Filing 9, Heaslip Affidavit at ¶ 1; Defendants' Brief at p. 3 n. 3).

During the time that he was a member of the bargaining unit, the Union was the plaintiff's exclusive bargaining agent, and the terms and conditions of his employment as a Marketing Representative were governed by the agreement between John Hancock and the Union.[3] (Id. at ¶ 1; Filing 9, Exhibit B—Agreement at Article I). Articles V and VI of the agreement establish a grievance and arbitration procedure which provides the

---

1. NASD is an organization that regulates investment brokers and broker dealers.

2. Collective bargaining agreements between John Hancock and the Union cover three-year terms, and there were three successive collective bargaining contracts during the plaintiff's employment with John Hancock: one contract was in existence from July 1, 1981, to June 31, 1984; one from July 1, 1984, to June 30, 1987; and one from July 1, 1987, to June 30, 1990. (Defendant's brief at 3). The provisions relevant to the disposition of the motion are contained in each of these contracts and are identical in all material respects. (Filing 9, Heaslip Affidavit at ¶ 7). The defendants' have submitted a copy of the contract that was in effect from July 1, 1987, to June 30, 1990, in support of their motion.

3. Article I of the pertinent agreement states that the Union is "the sole and exclusive collective bargaining representative with respect to rates of pay, wages, hours of employment, and other conditions of employment of all Marketing Representatives."

exclusive avenue by which employees may redress all employment-related disputes. Article V requires that "[A]ll grievances between the Marketing Representative and the Company shall be disposed of in accordance with the following relations procedure of this Article." (Id. at Article V). Following the completion of a four-step "Relations Procedure" set out in Article V, Article VI provides that grievances may be submitted to "final and binding" arbitration. (Id. at Article VI).

### b. The Facts

The plaintiff alleges that prior to his employ with the defendants he had no experience or education in the area of insurance, investments or other financial products, and therefore, the defendants undertook to train and educate the plaintiff in each of these areas ...[4] (Filing 1, Petition at ¶ 3). Throughout his tenure with the defendants, all of plaintiff's training and education was provided by or through the defendants. (Id.). In the spring of 1988, the defendants undertook an investigation of activities at the Omaha office and that "[a]s a result of the investigation and at the request of Defendants under threat of forced demotion, on June 13, 1988, Plaintiff resigned his sales manager position." (Filing 2, Petition at ¶ 10). The plaintiff did continue to work for defendants as a Marketing Representative. However, "[t]hroughout the spring and summer of 1988 and in particular after his forced resignation, Defendants reversed Plaintiff's commissions" so that "[b]y August of 1988, Plaintiff was not receiving any commissions for business written because Defendants were offsetting the reversals against such income." (Id. at ¶ 11). Therefore, "[b]ecause Defendants wrongfully prevented Plaintiff from earning commissions, on August of 1988 (sic), Plaintiff was forced to resign from the Defendant companies." (Id. at ¶ 12). The plaintiff never filed any grievances in relation to the claims he asserts in his petition. (Heaslip Aff. at ¶ 2).

Plaintiff filed this action in the District Court of Douglas County, Nebraska, on June 12, 1992. (Id. at p. 1). The petition contains four causes of action asserted against all three defendants with the plaintiff alleging as follows: (1) the defendants breached the "employment agreement" in their failure to adequately and reasonably train the plaintiff and their failure to pay the agreed upon commissions; (2) the defendants undertook to train and educate the plaintiff in the financial service industry but they did so in a negligent manner; (3) "throughout the summer of 1988" the defendants agents and employees contacted various clients of plaintiff, and in order to induce the clients to reverse business transactions placed with plaintiff, the agents and employees made "false, defamatory and malicious statements" regarding the plaintiff which resulted in the intentional infliction of mental distress to the plaintiff; and (4) defendants' actions resulted in plaintiff being wrongfully terminated.

The defendants removed the action to this court in December of 1992. The defendants then filed a motion for summary judgment. Defendants John Hancock and Variable al-

---

4. The plaintiff's petition almost never differentiates between the defendants' actions, but rather, the allegations generally speak to the "defendants" as if they were always acting in concert. This is despite the fact that it is clear that it is not always the "defendants" to which he should be referring but rather one particular defendant. In addition, there were times when the complaint spoke of one defendant but did not identify which defendant was being referred to in particular.

For example: (1) the petition states "During Plaintiff's employ, **Defendant** marketed and trained Plaintiff to market a "four-pay" policy." (Filing 1, Petition at ¶ 6 (emphasis added)). Since a four-pay policy is an insurance policy, and Distributors does not sell insurance, the court could only surmise that the plaintiff was referring to either Variable or John Hancock.; (2) it also states: "As a result of the investigation and at the request of **Defendants** under threat of forced demotion, on June 13, 1988, Plaintiff resigned his sales manager position." (Filing 1, Petition at ¶ 10 (emphasis added)). This statement is confusing in light of the fact that plaintiff's promotion came in relation to his employment with John Hancock only, and not the other two defendants. Therefore, one would assume that only John Hancock, and not the other two defendants, could threaten the plaintiff with demotion. These are yet a few examples of the confusion caused by imprecisely drafted pleading. For purposes of the factual statement, I will not differentiate between the defendants, but as seen in my discussion of the claims against Distributors in Part D, a distinction must be made.

lege that plaintiff's claims against them are preempted by federal labor law and thus barred by the applicable statute of limitations, and fail to state a claim upon which relief can be granted. (Filing 3 at p. 1–2). Defendant Distributors alleges that the plaintiff has failed to state a claim against it, or that at a minimum, plaintiff's claims must be stayed pending the submission of plaintiff's dispute with Distributors to NASD arbitration. (Id. at p. 2).

## II.  LEGAL ANALYSIS

### A.  Standard of Review

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is an extreme and treacherous device, which should not be granted unless the moving part has established a right to a judgment with such clarity as to leave no room for controversy, and unless the other party is not entitled to recover under any discernible circumstance. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Id.* Even if the district court is convinced that the moving party is entitled to judgment, the exercise of sound judicial discretion may dictate that the motion should be denied, in order that the case can be fully developed at trial. *McLain v. Meier,* 612 F.2d 349, 356 (8th Cir.1979).

Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). And, although under Federal Rule of Civil Procedure 56 due deference must be given to the rights of litigants to have their claims adjudicated by the appropriate finder of fact, equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy and inexpensive determination of the action where the claims have no factual basis. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

### B.  Plaintiff's Claims Against Defendant John Hancock

#### 1.  Pre-emption

The question before this court is whether plaintiff's state law claims are preempted by § 301 of the Labor Management Relations Act (LMRA). Section 301 of the LMRA states: "Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a) (1988).

The preemptive effect of § 301 was first analyzed in *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962) wherein the Court stated that "[t]he dimensions of § 301 required the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute [so that] issues raised in suits of a kind covered by § 301 [are] to be decided according to the precepts of federal labor policy." In *Lucas Flour,* the Court held that a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law, and therefore, a state rule that purports to define the meaning or scope of a term in a contract suit is preempted by federal labor law. *Id.* at 102–03, 82 S.Ct. at 576. Although preemption under section 301 does not apply in all instances in which a collective bargaining agreement is present[5], "[i]f the policies that animate § 301 are to be given their proper

---

5.  "Where a state-law remedy is independent of a collective bargaining agreement in the sense that resolution of the state-law claim does not require construing the collective bargaining agreement, preemption is inapplicable." *Johnson v. Anheu-ser Busch, Inc.,* 876 F.2d 620, 623 (8th Cir.1989) (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)).

range ... the preemptive effect of § 301 must extend beyond suits alleging contract violations." *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 210, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985).

In *Allis–Chalmers, supra*, the Supreme Court considered the availability of state law remedies to employees who, like the plaintiff, are covered by the terms of a collective bargaining agreement and who are seeking relief for employment-related disputes. In *Allis–Chalmers*, an employee who had suffered a back injury filed a state law tort action against his employer alleging bad faith in its handling of the employee's claim under a disability plan that had been established by a collective bargaining agreement. The Supreme Court, in reversing the decision of the Wisconsin Supreme Court [6] and holding that the employee's state law action could not be maintained, observed that the source of the employer's duty to pay the employee's disability claim stemmed from the collective bargaining agreement. The Court concluded that, because evaluation of the state law tort claim was "inextricably intertwined with consideration of the terms of the labor contract," 471 U.S. at 213, 105 S.Ct. at 1912, such a claim "must either be treated as a § 301 claim ... or dismissed as preempted by federal labor-contract law." 471 U.S. at 220, 105 S.Ct. at 1916.

In holding that the plaintiff's claim state law tort claim was preempted, the Court noted that:

> If respondent had brought a contract claim under § 301, he would have had to attempt to take the claim through the arbitration procedure established in the collective-bargaining agreement before bringing suit in court. Perhaps the most harmful aspect of

the Wisconsin decision is that it would allow essentially the same suit to be brought directly in state court without first exhausting the grievance procedures established in the bargaining agreement. The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in *Lucas Flour.* See 369 U.S., at 105 [82 S.Ct. at 577–78]. The parties here have agreed that a neutral arbitrator will be responsible, in the first instance, for interpreting the meaning of their contract. Unless this suit is pre-empted, their federal right to decide who is to resolve contract disputes will be lost.

> Since nearly any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract, the arbitrator's role in every case could be bypassed easily if § 301 is not understood to pre-empt such claims. Claims involving vacation or overtime pay, work assignment, unfair discharge—in short, the whole range of disputes traditionally resolved through arbitration—could be brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, *Republic. Steel Corp. v. Maddox*, 379 U.S. 650, 653 [85 S.Ct. 614, 616–17] (1965), as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance. 471 U.S. at 219–20, 105 S.Ct. at 1915.

The plaintiff argues that inasmuch as he was not a member of the collective bargain-

---

**6.** The Wisconsin Supreme Court had held that the suit did not arise under § 301 of the Labor Management Relations Act (LMRA), and therefore, was not subject to dismissal for failure to exhaust the arbitration procedures established in the collective-bargaining agreement. The court's reasoning was that a § 301 suit arose out of a violation of a labor contract, and that the claim here was a tort claim of bad faith. "Under Wisconsin law, the tort of bad faith is distinguishable from a bad-faith breach-of-contract claim: though a breach of duty exists as a consequence of the relationship established by con-

tract, it is independent of that contract." *Id.* at 207, 105 S.Ct. at 1909. Therefore, the court held, the violation of the labor contract was not relevant to the issue of whether the defendants exercised bad faith in the way they handled the plaintiff's claims, and thus was not a § 301 suit. In addition, the court found that the plaintiff's claim was not pre-empted by the NLRA in that the administration of disability-claim procedures under a collective-bargaining agreement is a matter only of peripheral concern to federal labor law, since payment of a disability claim is not a central aspect of labor relations. *Id.*

ing agreement during the time he was a staff manager, his claims could not be preempted by section 301. He bases this argument on the fact that there was an "anticipatory breach" of the agreement at the time he was told that his commissions were going to be reversed and that this breach occurred at the time he was still a Staff Manager and not a member of the bargaining unit. In addition, he alleges in his brief that many of the statements made by the defendants' employees, which form the basis for the intentional infliction of mental distress claim occurred after the time that he had already left the defendants' employ and therefore was similarly not a member of the bargaining unit.

I do not find the plaintiff's arguments persuasive. In the first instance, the primary activity which forms the core of plaintiff's causes of action involves the training and education he received by the defendant when he was a Marketing Representative and therefore, a member of the collective bargaining unit. In addition, the plaintiff's allegations center around the reversal of his commissions. I note that even if plaintiff's allegations are true that he was forewarned or threatened with the reversal of commissions at the time he was a Staff Manager and not a member of the bargaining unit, he was a Marketing Representative, and thus a member of the unit, at the time his commissions were actually reversed.

As to plaintiff's claim in relation to the intentional infliction of mental distress claim that "the pattern of activity occurred, for the most part, after Plaintiff left Hancock" (Plaintiff's Brief at p. 3), the court notes that the plaintiff's complaint states that the statements complained of, giving rise to this cause of action, occurred "[t]hroughout the summer of 1988." (Filing 1, Petition at ¶ 26). From June, 1988, until August of 1988, the plaintiff was still employed by the defendants as a Marketing Representative, and thus a member of the collective bargaining unit.

■ With these standards and principles in mind, I turn now to an examination of each state-law claim to determine whether inter-

pretation of the collective bargaining agreement is necessary to resolve the count.

### a. Breach of Contract

Behrens alleges that the John Hancock breached the employment contract by failing to provide him with proper training and in reversing his commissions. By its very terms, this cause of action flows from the collective bargaining agreement ("the agreement").[7]

The agreement contains specific provisions regarding the hiring, supervision, assignment and training of Marketing Representatives, as well as provisions regarding the compensation which is due Marketing Representatives. Article VII of the agreement provides: "The Company retains the exclusive right to manage its business and to direct and control its Marketing Representatives ... [including]: 1. The right to hire, supervise, and train its Marketing Representatives." (Filing 9, Exhibit B at 15–16). Article XVII details the compensation due Marketing Representatives. (Id. at 50–111). In addition, the agreement contains various provisions that define the bases upon which John Hancock may "reverse" or "charge back" a Marketing Representative's commissions and cease payment of commissions after termination of employment. (Id. at Article XVI, Sections 4, 14 and 15; Article XVII, Section 17).

This cause of action would necessarily require an interpretation of the terms of the collective bargaining agreement. I find, therefore, that the plaintiff's breach of contract claim is "inextricably intertwined" with the terms of the bargaining agreement and thus, is preempted by § 301.

### b. Negligence

Behrens claims that John Hancock "undertook to train and educate Plaintiff in the financial services industry, but did so in a negligent manner." (Filing 1, Petition at ¶ 22). Here, as in the breach of contract action, the defendant's duty to train and educate plaintiff arose from the agreement.

---

7. I note that the plaintiff does not allege that there was another contract in place which gov-

erned his employment with John Hancock.

Thus, this claim is similarly inextricably intertwined with the terms of the agreement and is pre-empted by § 301.

### c. Intentional Infliction of Mental Distress

In this cause of action, Behrens alleges:

26. Throughout the summer of 1988, Defendants' agents and employees contacted various clients of Plaintiff with the intention of reversing Plaintiff's business and replacing it with their own. In order to induce the clients to do so, such agents and employees made false, defamatory and malicious statements regarding Plaintiff.

27. Although the sales techniques alleged above [which allegedly resulted in plaintiff's demotion] were used by most agents in the Omaha office and elsewhere, Defendants used the investigation of those techniques to force Plaintiff to bear the consequences for the entire office. (Filing 1, Petition at ¶¶ 26 and 27).

In sum, plaintiff's claim is based on the actions of John Hancock's agents and employees, who singled out plaintiff for an investigation of his use of sales techniques that were used by other Marketing Representatives and allegedly contacted plaintiff's customers and presumably informed them of plaintiff's practices in order to persuade them to replace their policies or cancel business dealings with the plaintiff.

In *Johnson v. Anheuser Busch, Inc.,* supra, an employee had been accused of slashing the car tires of a fellow employee while the car was parked in the company lot. The employee was arrested and charged with destruction of property, but the charges were eventually dismissed. As a result of this incident, however, Anheuser Busch terminated the employee for violations of plant rules.[8]

The employee brought suit against his former employer and other employees in state court alleging, *inter alia,* intentional inflection of emotional distress, slander, and wrongful discharge. The lawsuit was removed on the basis of section 301 and the defendants filed a motion to dismiss for failure to state a claim or in the alternative for summary judgment on the basis that the claims were preempted by the LMRA. *Id.* at 622. The trial court granted the motion as to the foregoing counts and the Eight Circuit affirmed. After discussing the "inextricably intertwined" test, the court went on to a claim by claim analysis. In discussing the claim for intentional infliction of emotional distress, the court stated:

Similarly, [plaintiff's] second count, alleging intentional infliction of emotional distress, arises out of his discharge and the [employer's] conduct in the investigation leading up to it. Specifically, [plaintiff] alleged in his petition that the outrageous conduct of Anheuser–Busch and its employees and the statements made by [the employees] "caused [him] severe and great emotional distress, and such accusations led to [his] arrest, prosecution and loss of his job." To determine the merits of this allegation would require use to decide whether his discharge was warranted under the terms of the collective bargaining agreement. We conclude that this count depends substantially upon construing the collective bargaining agreement's terms. Therefore, section 301 preempts this count. *Id.* at 624 (citations omitted).

In the case at bar, Behrens' allegations of intentional infliction of emotional distress arise out of John Hancock's investigation of plaintiff's use of various selling techniques and the communications made by John Hancock employees to a number of Behrens' clients in relation to his use of such techniques. In order to resolve this claim, one would have to look to the training and education received by plaintiff as well as whether John Hancock's conduct was warranted by the terms of the agreement. Therefore, as this claim can only be resolved pursuant to a determination of what rights and obligations each party retained under the collective bargaining agreement, the plaintiff's claim is preempted by § 301. See, also, *Johnson v. Beatrice Foods Co.,* 921 F.2d 1015, 1020 (10th Cir.1990) (claim for intentional infliction of

---

8. The plant rules prohibited "horseplay, malicious mischief or other conduct affecting the rights of other employees," and "immoral conduct or conduct which violates the common decency of fellow employees." *Id.* at 622.

emotional distress preempted by Section 301 since "outrageousness" cannot be determined without analyzing whether conduct was allowed under collective bargaining agreement); *Cook v. Lindsay Olive Growers,* 911 F.2d 233, 239 (9th Cir.1990) (claims for intentional and negligent infliction of emotional distress preempted under Section 301—the agreement must be examined and interpreted to determine if conduct was negligent, or extreme and outrageous); *Douglas v. American Information Technologies Corp.,* 877 F.2d 565, 571–72 (7th Cir.1989) (claim for intentional infliction of emotion distress preempted under Section 301).

### d. Wrongful Termination

Plaintiff's final cause of action alleges that the defendant's actions in "charging reversed business" against him forced him to terminate his employment. (Filing 1, Petition at ¶ 31). As previously discussed, the collective bargaining agreement contains provisions regarding Market Representatives' compensation and commissions as well as John Hancock's rights to "charge reversed business" or reverse commissions against a terminated employee. (Filing 9, Exhibit B at Articles XVI and XVII). Therefore, resolution of plaintiff's claim of wrongful termination would necessarily involve interpretation of the collective bargaining agreement as it would be impossible to determine whether John Hancock's actions in reversing Behrens' commissions were wrongful without referring to the agreement. Accordingly, I must find that the plaintiff's claim for wrongful termination is preempted by § 301. See, *Hanks v. General Motors Corp.,* 859 F.2d 67 (8th Cir.1988) (holding that in order to determine whether Hanks was wrongfully discharged, the court must interpret the terms of the collective bargaining agreement and thus the claim was preempted by section 301).

### 2. Six Month Statute of Limitations

■ A cause of action under § 301 of the LMRA, must be filed within six months after the claim arises. *Tripp v. Angelica Corp.,* 921 F.2d 794 (8th Cir.1990) (citing *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 170, 103 S.Ct. 2281, 2294, 76 L.Ed.2d 476 (1983)). Inasmuch as I have determined that all of plaintiff's causes of action against John Hancock are preempted by section 301, I must now determine whether plaintiff properly filed his petition within the requisite 6–month time period.

I note that all of plaintiff's allegations against the defendants occurred during 1988. The plaintiff did not file this action, however, until June of 1992. Thus, the plaintiff's causes of action against John Hancock are time barred. Accordingly, John Hancock's motion for summary judgment should be granted as to all four causes of action.

### C. Plaintiff's Claims Against Variable

As previously discussed, Variable is a wholly-owned subsidiary of John Hancock through which variable life insurance policies are sold, and the collective bargaining agreement which covers John Hancock Marketing Representatives also covers those representatives when they sell products of Variable. Therefore, just as Behrens' claims against John Hancock are preempted by section 301 because their resolution depends upon a construction of the agreement, so too are the claims asserted against Variable. Accordingly, the defendants' motion for summary judgment is granted as to Variable.

### D. Plaintiff's Claims Against Distributors

■ Distributors is in the business of marketing investment products such as mutual funds and other securities, but does not sell insurance products. As previously discussed, Distributors utilizes the services of independent contractors called Registered Representatives to market its investment products, and these independent contractors are required to register with the NASD as a precondition to becoming a Distributors' representative, and thus, Plaintiff's employment with Distributors is derivative of his employment with John Hancock. An individual's employment with Distributors is automatically terminated upon the termination of his employment, for any reason, with John Hancock.

The claims in plaintiff's complaint stem from alleged sales tactics used by plaintiff that he learned in the training he received from John Hancock. The plaintiff alleges:

5.  As a part of the training provided to Plaintiff, Pravecek instructed Plaintiff how to perform "fabricated defensive replacements". A defensive replacement of an **insurance policy** is replacement of an existing policy with a new policy because the policy owner has been approached by another company with a proposal. Fabrication of a defensive replacement involves creation of a competitive proposal. Pravecek assured Plaintiff that this procedure was used throughout the Defendant companies and that upper management was aware of the use of the procedure.

6.  During Plaintiff's employ, **Defendant** marketed and trained Plaintiff to market a "four-pay" policy. The four-pay policy was designed to require four annual premium payments from the policy owner before the policy dividends and/or values would pay the premium. Plaintiff sold several of these policies to clients. In fact, the four pay policy did not work as designed and policy owners had to make several additional years of annual payments. (Filing 1, Petition at ¶¶ 5 and 6 (emphasis added)).

Therefore, based on my reading of the petition, the claims asserted by the plaintiff stem from, or are related to, his activities as a Marketing Representative of insurance products and the training he received in using—"four-pay policies" and "fabricated defensive replacements" (Id. at ¶¶ 15–19, 22, 27, and 31). In addition, the petition only refers to the fact that one defendant trained him in the sale of these insurance policies. As previously discussed, Distributors is not involved in the sale of insurance policies, and therefore can be eliminated from consideration in relation to these claims.

Although the petition contains a general allegations as to the fact that the plaintiff was to be trained by the "Defendants" there are no specific allegations as to any improper training he received in relation to marketing securities products. Furthermore, it would appear that all damages that Behrens claims

to have suffered are damages based upon the reversal of commissions from his sale of insurance, the loss of his position as a John Hancock Sales Manager, and his alleged inability to continue in the field of insurance sales. (Id. at ¶¶ 6, 8, 10–33).

Therefore, based on the foregoing, I find that plaintiff has failed to state a cause of action against Distributor under any of the four causes of action presented in the petition. I will, however, grant the plaintiff 10 days from the date of this order in which to amend his complaint in order to state a cause of action against the remaining defendant Distributors. Although I note that it appears to the court that even if plaintiff can successfully state a cause of action against Distributors, it is very likely that any action against said defendant would have to be stayed pending arbitration.[9]

Accordingly, Distributor's motion for summary judgment should be held in abeyance for 10 days. In the event that plaintiff fails to file an amended complaint within 10 days, Distributors motion for summary judgment will be granted for the reason that the plaintiff will have failed to state a cause of action for which relief can be granted.

IT IS ORDERED:

1.  that the defendants' motion for summary judgment, filing 3, is granted in part and held in abeyance in part;

2.  that the defendants' motion is granted as to John Hancock and Variable and held in abeyance as to Distributors for 10 days from the date of this order; and

3.  that the plaintiff is granted 10 days from the date of this order in which to file an amended complaint which states a cause of action as to the remaining defendant, Distributors, in the absence of which, this court will grant the defendants' motion for summary judgment as to Distributors.

9.  Plaintiff executed a Form U–4 Uniform Application for Securities Industry Registration or Transfer which contained the following undertaking: "I agree to arbitrate any dispute, claim or controversy that may arise between me and

my firm, or a customer, or any other person, that is required to arbitrated under the rules, constitutions, or by-laws of the organizations with which I register...." (Filing 9, *Exhibit D*, U–4 form at page 4, ¶ 5).