**Timothy H. POOLE, Plaintiff,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware corporation, Defendant.**

**No. 4:96CV3035.**

United States District Court, D. Nebraska.

June 16, 1997.

James L. Cox, Jr., Morrisard, Rossi, Cox, Kiker & Inderwish, Aurora, CO, for plaintiff.

Charles W. Shewmake, Burlington Northern Railroad Company, Fort Worth, TX, Douglas J. Peterson, Knudsen, Berkheimer, Richardson & Endacott, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Timothy Poole, a former employee of defendant Burlington Northern Railroad Company ("BN"), brings this action under Nebraska law for damages and equitable remedies arising out of BN's termination of Poole's employment after Poole allegedly had alcohol on his breath while on railroad property at a time when Poole was off duty. In this diversity action, Poole alleges that BN's investigation and termination of him (1) violated Neb.Rev.Stat. § 48–1903 (Michie 1995), the Nebraska statute that governs use of drug and alcohol tests on employees; (2) violated the Nebraska Fair Employment Practice Act, Neb.Rev.Stat. §§ 48–1101 to –1125 (Michie 1995); (3) constituted intentional infliction of emotional distress; and (4) constituted invasion of privacy by placing Poole before the public in a false light pursuant to Neb.Rev.Stat. § 20–204 (Michie 1995). (Filing 1 ¶¶ 1–3 and 63–89.[1])

Pending before the court is BN's motion for summary judgment (filing 13), in support of which BN makes these arguments: (1) Poole's four claims are preempted by the mandatory and exclusive dispute resolution procedures set forth in the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–163, 181–188, and the parties' collective bargaining agreement ("CBA") ("forum preemption"); (2) Poole's claim that BN violated the Nebraska alcohol- and drug-testing statute, Neb.Rev. Stat. § 48–1903, is preempted because Congress has occupied the field with respect to alcohol-testing requirements for railroad employees ("field preemption") and, alternatively, Neb.Rev.Stat. § 48–1903 is inapplicable to this case; and (3) Poole has failed to establish the elements of his claims for intentional infliction of emotional distress and invasion of privacy. (Def.'s Br.Supp. Def.'s Mot. Summ.J. at 2–3.) BN has submitted evidence in support of its claims (filings 14 & 16).

---

1. BN's motion to strike paragraphs 4 through 62 of Poole's complaint and all accompanying evidentiary material was granted in Filing 7.

Poole also has submitted a brief and evidence (filing 27) in response to BN's motion for summary judgment, arguing that: (1) the forum preemption doctrine is inapplicable because none of Poole's claims depend for their resolution on interpretation of the parties' collective bargaining agreement and the CBA is not the only source of Poole's state claims; (2) the field preemption doctrine is inapplicable because BN has not established Congress' clear and manifest purpose to preempt the field as to alcohol testing of railroad employees who are off duty; and (3) Poole has established the elements of his intentional infliction of emotional distress and invasion of privacy claims. Because Poole concedes that he cannot prevail on his Nebraska Fair Employment Practice Act claim, I shall dismiss that claim. (Pl.'s Br. Opp'n Def.'s Mot. Summ.J. 9–31.)

For the reasons discussed below, I shall grant BN's motion for summary judgment (filing 13) on all claims except Poole's false light invasion of privacy claim.

## I. UNDISPUTED MATERIAL FACTS

1. Defendant BN is a corporation organized and existing under the laws of Delaware and is engaged in the business of a common carrier by rail in several states, including Nebraska. (Filing 1, Complaint ¶ 1; Filing 8, Answer ¶ 1.)

2. Plaintiff Poole was employed by BN in various positions, including conductor, from June 26, 1978, until May 30, 1995. (Filing 1, Complaint ¶ 2; Filing 8, Answer ¶ 2.) While employed by BN, Poole was a member of the collective bargaining unit represented by the United Transportation Union ("UTU") pursuant to a collective bargaining agreement ("CBA") between UTU and BN. (Filing 16,

Aff. John H. Waldron ¶ 1; Filing 1, Complaint ¶ 70.)

3. Sometime after April 21, 1995, Poole received a letter written by BN supervisor E.E. Percival requesting that Poole set up an interview with certain individuals before April 21, 1995, to discuss "BN's policies and [BN's] expectations" with Poole regarding his "personal work history." (Filing 27, Ex. C, Aff. Timothy H. Poole ¶ 4 & Attach. A[2].) Poole did not receive this letter before April 21, 1995, because the letter was sent to Poole's old address. (Filing 27, Ex. C, Aff. Timothy H. Poole ¶ 4; Filing 14, Ex. F.)

4. On April 24, 1995, Poole was not on duty, as BN had previously granted Poole's request for personal leave on April 24 and 25, 1995. At 10:30 a.m. on April 24, 1995, BN supervisor Mark Bruce telephoned Poole and requested that Poole come to BN's offices in McCook, Nebraska, to be "interviewed" regarding "safety" and "performance" issues, as Percival's letter had requested. Based on Bruce's words and tone of voice, Poole understood that the meeting was mandatory and should occur immediately. Poole agreed to attend the "interview" at 1:30 that afternoon. (Filing 27, Ex. C, Aff. Timothy H. Poole ¶¶ 5, 6, 8; Filing 27, Ex. A 237:22–24; 239:5–12; 411:15–18; 535:21–22[3]; Filing 14, Aff. F.W. Comiskey & Ex. F.)

5. BN supervisors Bruce and Percival were present at the 1:30 p.m. meeting with Poole. (Filing 27, Aff. Timothy H. Poole ¶¶ 9.) During the meeting, the supervisors noticed what they perceived to be an odor of alcohol coming from Poole, after which they offered to refer Poole to a rehabilitation program, which Poole refused. Upon such refusal, Poole was removed from service pending an investigation of Poole's possible violation of Rule 1.5 of the BN General

---

**2.** The signatures of Poole and the notary public on the last page of Poole's affidavit (filing 27, ex. 3) are not original; rather, the last page of Poole's affidavit appears to be a photocopy. However, BN has not objected to consideration of the affidavit.

**3.** Poole has submitted as evidence excerpts of a transcript of Poole's investigation held on May 17 and 18, 1995. The transcript in its entirety was stricken in Filing 7, as it was submitted with Poole's complaint. The parties have stipulated that "the Transcript of the Investigation conduct-

ed May 17 & 18, 1995, *included in Plaintiff's Evidence Index*," was prepared by BN "in the normal course of its business and as a record of a regularly conducted business, as defined in FRE 803(6)." (Filing 31 (emphasis added).) In his brief, Poole has referred only to the transcript excerpts that appear in his evidentiary materials in opposition to BN's motion for summary judgment (filing 27). Therefore, I have not considered other portions of the transcript or its exhibits.

Code of Operating Rules, which restricts drug and alcohol use by employees. (Filing 14, Ex. F; Filing 16, Aff. John H. Waldron ¶¶ 2, 9.)

6. BN Policy V.H.2.c, which is entitled "Application of the Alcohol/Controlled Substances Testing Policy," states in part that "[i]f a supervisor detects the odor of alcohol on an employee, ... the employee shall be removed from service and an investigation scheduled." (Filing 16, Ex. E.)

7. On May 17 and 18, 1995, Poole was the subject of a disciplinary investigation conducted in McCook, Nebraska, by F.W. Comiskey, who at that time was employed by BN as Terminal Superintendent in Denver, Colorado. During the investigation, two BN officers testified that they smelled alcohol on Poole's breath while meeting with him on the afternoon of April 24, 1995, at the McCook, Nebraska, Division Office of Burlington Northern Railroad Company. The officers further testified that they gave Poole an opportunity to submit to a voluntary blood test at a local hospital to confirm his contention that he had not consumed alcohol, and that after conferring with his union representative, Poole declined to submit to a blood test. Poole attended the investigation with his UTU representative, Ray Lineweber. Lineweber was given an opportunity to cross-examine witnesses; call Poole and others to testify as witnesses; and offer evidence on behalf of Poole, all of which he did. (Filing 14, Aff. F.W. Comiskey ¶ 3; Filing 27, Ex. C, Aff. Timothy H. Poole ¶ 16.)

8. Based upon the information developed in the investigation, BN dismissed Poole from his employment on May 30, 1995, for violation of Rule 1.5 of the BN General Code of Operating Rules, which provides:

**1.5  Drugs and Alcohol**

The use or possession of alcoholic beverages while on duty or on company property is prohibited. Employees must not have any measurable alcohol in their breath or in their bodily fluids when reporting for duty, while on duty, or while on company property.

The use or possession of intoxicants, over-the-counter or prescription drugs, narcotics, controlled substances, or medication that may adversely affect safe performance is prohibited while on duty or on company property, except medication that is permitted by a medical practitioner and used as prescribed. Employees must not have any prohibited substances in their bodily fluids when reporting for duty, while on duty, or while on company property.

(Filing 14, Aff. F.W. Comiskey ¶ 4 & Exs. A & B.)

9. BN Rule 1.5 has been in effect in one form or another at BN and its predecessors for at least 40 years. The predecessor of Rule 1.5 was Rule G, an industry-wide rule against the use or possession of alcohol while on railroad property. Rule 1.5 is still commonly referred to as "Rule G." (Filing 16, Aff. John H. Waldron ¶ 3.)

10. The collective bargaining agreement between BN and UTU allows BN to hold an employee from service pending a disciplinary hearing "in serious cases, such as ... Rule 'G' violation[s]." The portions of the CBA submitted as evidence outline procedures for the assessment of discipline such as notice requirements, the right to present witnesses and to be represented, conduct at the hearing, time parameters for the hearing decision, and time limits on appeals. (Filing 14, Ex. H.) The CBA further sets forth deadlines for filing "claims" from disciplinary decisions and subsequent appeals. (Filing 14, Ex. I.)

11. Pursuant to these appeal provisions in the CBA, a UTU local chairman appealed Poole's discharge on July 28, 1995, to a BN division superintendent. Division Superintendent D.L. Maze denied the appeal on September 7, 1995. On November 9, 1995, a UTU general chairman appealed Poole's discharge to D.J. Kozak, BN's Assistant Vice President for Labor Relations. Kozak denied the appeal on January 31, 1996. UTU then submitted Poole's claim to arbitration before Public Law Board No. 3304, an arbitration panel established pursuant to the RLA and consisting of one carrier member, one union member, and one neutral member. The panel held a hearing on Poole's claim on October 10, 1996, and, according to the parties, the claim is still pending. (Filing 16, Aff. John H. Waldron ¶ 16 & Exs. J–M .)

12. BN states that "[c]harges, investigation, and resulting disciplinary action are communicated only to the employee, his union representative, and management employees involved in the disciplinary process," and that "BN does not disclose disciplinary matters to other employees or to the public." Poole states that since his termination, "several individuals have indicated to [him] that they know [he has] been terminated from BN employment because of a Rule 1.5 alcohol violation," and that Poole "believe[s] BN has publicized [his] termination for a Rule 1.5 alcohol violation to many others." (Filing 16, Aff. John H. Waldron ¶ 13; Filing 27, Aff. Timothy H. Poole ¶ 18.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.), *cert. denied*, 513 U.S. 929, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir.1980). *See also Reierson v. Resolution Trust Corp.*, 16 F.3d 889, 891 (8th Cir.1994).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with " 'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.' " *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir.1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. Forum Preemption

### 1. Law

As stated above, BN's first argument is that Poole's state-law claims are preempted by the RLA because such claims depend on interpretation of the BN–UTU collective bargaining agreement for resolution. (Def.'s Br. Supp. Def.'s Mot.Summ.J. at 16–27.) Poole argues that none of his state-law claims are wholly grounded upon, or require interpretation of, the BN–UTU collective bargaining agreement, and that resolution of his claims involves purely factual inquiries. (Pl.'s Br. Opp'n Def.'s Mot.Summ.J. at 9–24.)

With an eye toward encouraging stability in labor-management relations, the RLA set up a "mandatory arbitral mechanism" to address disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 & 252, 114 S.Ct. 2239, 2241 & 2243, 129 L.Ed.2d 203 (1994). The RLA provides for the "prompt and orderly settlement" of two types of disputes: (1) those concerning "rates of pay, rules, or working conditions," which have been deemed "major" disputes, 45 U.S.C. § 151a(4); *Norris*, 512 U.S. at 252, and (2), 114 S.Ct. at 2243 and (2) those "growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," which constitute "minor" disputes, 45 U.S.C. § 151a(5); *Norris*, 512 U.S. at 252–53, 114 S.Ct. at 2243–44.

"Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." *Norris*, 512 U.S. at 252, 114 S.Ct. at 2243. The United States Supreme Court has held that 45 U.S.C. § 151a, referenced above, does not "demonstrate[ ] a clear and manifest congressional purpose to create a regime that broadly pre-empts substantive protections

extended by the States, independent of any negotiated labor agreement." *Norris,* 512 U.S. at 255–56, 114 S.Ct. at 2245–46. Instead, categorizing a dispute as "minor" under 45 U.S.C. § 151a—and thereby concluding that the RLA preempts a state cause of action to enforce a right involved in that dispute—means determining whether the dispute is "grounded in the collective-bargaining agreement"; involves "the interpretation or application of existing labor agreements"; and "involve[s] duties and rights created or defined by the collective-bargaining agreement." *Id.* at 256 & 258, 114 S.Ct. at 2245 & 2246. In short, "a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the collective-bargaining agreement." *Id.* at 260, 114 S.Ct. at 2247.

The Supreme Court has noted that disposition of state-law claims that requires analysis of "purely factual questions" about the conduct and motives of employees or employers does not require interpretation of terms of a collective bargaining agreement. *Id.* at 261–62, 114 S.Ct. at 2248–49 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 407, 108 S.Ct. 1877, 1882, 100 L.Ed.2d 410 (1988)). Further, even if a dispute would require addressing the same set of facts whether the claim was pursued under a collective bargaining agreement or under state law, the claim is independent of the CBA for preemption purposes " 'as long as the state-law claim can be resolved without interpreting the agreement itself.' " *Id.* at 262, 114 S.Ct. at 2249 (quoting *Lingle,* 486 U.S. at 410, 108 S.Ct. at 1883).

In deciding whether the collective bargaining "agreement" must be interpreted to resolve a state-law claim, it should be noted that such agreements may include implied and express terms, and the parties' custom, usage, and practice is significant in interpreting the substance of the agreement. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311, 109 S.Ct. 2477, 2484, 105 L.Ed.2d 250 (1989). A collective bargaining agreement is a " 'generalized code' " that governs cases which the drafters cannot anticipate. A CBA " 'covers the whole employment relationship' " and en-

compasses " 'the common law of a particular industry or of a particular plant.' " *Id.* at 311–312, 109 S.Ct. at 2484–85 (quoting *Transportation–Communication Employees Union v. Union Pacific R.R. Co.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966)).

The principle of preemption, as reflected by the above mode of analysis, evolves from the idea that, for the sake of consistent results, the arbitrator should be responsible for interpreting a labor contract in the first instance pursuant to uniform federal labor-law principles, while judges should be charged with determining questions requiring application of a wide range of state labor laws when such questions do not require interpreting labor contracts themselves. *Lingle,* 486 U.S. at 406 & 411, 108 S.Ct. at 1881 & 1884.

The forum preemption question in the case at bar is whether Poole may pursue remedies available under state law for violation of Nebraska's alcohol-testing statute, intentional infliction of emotional distress, and invasion of privacy, or whether Poole's claims are preempted by the RLA such that he must seek relief only through the RLA's "mandatory arbitral mechanism." BN contends that Poole's claim is essentially that he did not violate Rule 1.5 and that BN violated the CBA by terminating him without just cause; that such a claim is a "minor" dispute under the RLA; and that Poole's claims are preempted by the RLA and must therefore be brought pursuant to the RLA arbitral mechanisms. (Def.'s Br.Supp.Mot.Summ.J. at 12–15.)

### 2. *Analysis*

[S]tates can provide workers with substantive rights independent of the collective bargaining agreement and causes of action to enforce such rights are not pre-empted by the RLA. Thus, the critical question is one of characterization—does the state law claim involve interpretation or application of the collective bargaining agreement or, stated another way, is the state law claim independent of the collective bargaining agreement.

*Taggart v. Trans World Airlines, Inc.*, 40 F.3d 269, 272 (8th Cir.1994) (internal citations omitted).

With these principles in mind, I shall now analyze each of Poole's state-law claims to determine whether each claim involves the interpretation or application of the BN–UTU collective bargaining agreement.

### a. Alcohol–Testing Statute Claim

■ Poole's first claim is that BN violated Neb.Rev.Stat. § 48–1903 (Michie 1995) when its supervisors relied only upon a perceived smell of alcohol on Poole's breath to deny Poole continued employment without performing a "test" on Poole's bodily fluid or breath and without confirming such test result, as required by the statute. (Filing 1, Complaint ¶¶ 65–66.) Neb.Rev.Stat. § 48–1093 provides:

§ 48–1903. **Test results; use; requirements.**

Any results of any test performed on the body fluid or breath specimen of an employee, as directed by the employer, to determine the presence of drugs or alcohol shall not be used to deny any continued employment or in any disciplinary or administrative action unless the following requirements are met:

(1) A positive finding of drugs by preliminary screening procedures has been subsequently confirmed by gas chromatography-mass spectrometry or other scientific testing technique which has been or may be approved by the department; and

(2) A positive finding of alcohol by preliminary screening procedures is subsequently confirmed by either:

(a) Gas chromatography with a flame ionization detector or other scientific testing technique which has been or may be approved by the department; or

(b) A breath-testing device operated by a breath-testing-device operator. Nothing in this subdivision shall be construed to preclude an employee from immediately requesting further confirmation of any breath-testing results by a blood sample if the employee voluntarily submits to give a blood sample taken by qualified medical personnel in accordance with the rules and regulations adopted and promulgated by the department. If the confirmatory blood test results do not confirm a violation of the employer's work rules, any disciplinary or administrative action shall be rescinded.

Except for a confirmatory breath test as provided in subdivision (2)(b) of this section, all confirmatory tests shall be performed by a clinic, hospital, or laboratory which is licensed pursuant to the federal Clinical Laboratories Improvement Act of 1967, 42 U.S.C. 263a, or which is accredited by the college of American Pathologists.

In support of its summary judgment motion, BN does not argue that this statute does not provide a cause of action, but rather that (1) this statute is inapplicable to Poole's termination from employment because the statute does not require a fluid or breath specimen in order to justify discharge from employment—it simply provides minimum standards when an employer chooses to rely on such specimens—and (2) Poole's "real complaint"—that is, that BN lacked just cause under the CBA to discharge him—requires interpretation of the CBA, of which Rule 1.5 is a part. (Def.'s Br. Supp.Mot.Summ.J. at 20–21.)

Assuming section 48–1903 provides Poole a cause of action, application of the statute to his discharge from BN would require determining (1) whether the BN supervisors' alleged smelling of alcohol on Poole's breath was a "test performed on the ... breath specimen of an employee" within the meaning of the statute; (2) whether the result of the "test" was positive; (3) whether the result of the test was used to deny Poole continued employment; and (4) whether a "positive finding of alcohol by preliminary screening procedures" was subsequently confirmed by either (a) gas chromatography with a flame ionization detector or other scientific testing technique approved by the Department of Health, or (b) a breath-testing device as defined by the statute.

Each of these inquiries is a "purely factual question" that does not require interpretation of the BN–UTU collective bargaining agreement for resolution. *Norris*, 512 U.S. at 261–62, 114 S.Ct. at 2248–49; *Lingle*, 486

U.S. at 407, 108 S.Ct. at 1882. Resolution of this claim requires the application of findings of fact to relevant statutory language and does not depend on duties, rights, or obligations created or defined by the CBA. *Norris*, 512 U.S. at 259, 114 S.Ct. at 2247. Therefore, Poole's statutory claim based on Neb.Rev.Stat. § 48–1903 is not preempted by the RLA, and BN's forum preemption argument as to this claim is not persuasive.

### b. *Intentional Infliction of Emotional Distress Claim*

Poole next alleges that BN intentionally or recklessly interfered with Poole's ability to earn a living by requesting that Poole come onto BN property for a performance evaluation on April 24, 1995, when BN knew or should have known that Poole was not on duty at the time and was not subject to call; by accusing Poole of having alcohol on his breath when a third BN supervisor who was called into the performance evaluation meeting did not smell alcohol on Poole's breath; by removing Poole from service; by failing to reinstate Poole after BN learned or could have learned that on April 24, 1995, at 6:00 p.m. Poole went to a certified facility and had a urinalysis which determined that the blood alcohol in his system was 0.00 ethyl alcohol grams/deciliter; by proceeding with a formal investigation of Poole; and by dismissing Poole from employment after this formal investigation. (Filing 1, Complaint ¶¶ 81–83.)

■ To establish a cause of action for intentional infliction of emotional distress in Nebraska, the following elements must be met:

"(1) [t]hat there has been intentional or reckless conduct; (2) [t]hat the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) [t]hat the conduct caused emotional distress so severe that no reasonable person should be expected to endure it."

*Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 718, 508 N.W.2d 907, 910 (1993) (quoting *Nichols v. Busse*, 243 Neb. 811, 817, 503 N.W.2d 173, 179 (1993)).

■ Poole's allegation of intentional infliction of emotional distress arises from BN's conduct in identifying Poole's alleged violation of its alcohol- and drug-use policy; removing Poole from service while the alleged violation was being investigated; investigating the charge; and ultimately discharging Poole. Thus, Poole's claim revolves around his discharge from BN and the procedures BN followed in identifying, investigating, and acting upon Poole's alleged violation of BN's alcohol policy.

To resolve this claim on the merits, one must interpret the CBA in order to have a reference point for determining the outrageousness of BN's procedures in acting upon Poole's possible alcohol policy violation, and whether those procedures were " 'so extreme in degree as to go beyond all possible bounds of decency,' " such that the procedures could be characterized as " 'atrocious and utterly intolerable in a civilized community.' " *Schieffer*, 244 Neb. at 718, 508 N.W.2d at 910 (quoting *Nichols v. Busse*, 243 Neb. 811, 817, 503 N.W.2d 173, 179 (1993)).

Because Poole's claim is grounded in the appropriateness of BN's procedures in identifying and investigating an alcohol policy violation and the validity of the ultimate result reached, the substance of Poole's claim cannot be resolved without reference to the literal terms of the CBA (filing 14, ex. H, addressing procedures for discipline investigations and assessment of discipline; filing 14, ex. I, addressing appeals from disciplinary decisions), as well as to implied terms of the CBA regarding alcohol policy violations and related procedures, as developed by past practice, custom, and usage (filing 14, ex. B, Rule 1.5). *See Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620 (8th Cir.1989) (intentional infliction of emotional distress claim by fired employee preempted by Labor Management Relations Act ("LMRA") [4]

---

4. In *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260, 114 S.Ct. 2239, 2247, 129 L.Ed.2d 203 (1994), the Supreme Court stated that the pre-emption standard it adopted for disputes under the RLA "is virtually identical to the preemption

in case where employee was terminated for violating plant misconduct rules by slashing another employee's tires; claim preempted because it arose out of employee's discharge and employer's conduct in investigation leading up to it, and CBA must be consulted to determine if discharge was warranted)[5]; *Behrens v. John Hancock Mutual Life Ins. Co.*, 834 F.Supp. 1468 (D.Neb.1993) (claim of intentional infliction of emotional distress by employee who was allegedly forced to resign due to employer's wrongful prevention of employee earning commissions preempted by LMRA because claim could be resolved only by determining what rights and obligations each party retained under CBA). *See also Smith v. Houston Oilers, Inc.*, 87 F.3d 717 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996) (claim for intentional infliction of emotional distress preempted by LMRA when issue was whether defendants had legal right to require plaintiffs, injured football players, to endure an excessively demanding rehabilitation program or quit; dispute was fundamentally a labor dispute and question was one of contract law involving the CBA); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 171, 136 L.Ed.2d 112 (1996) (in order to evaluate whether defendant's conduct was outrageous in context of intentional infliction of emotional distress claim, the conduct must be measured against CBA; therefore, resolution of claim required interpretation of CBA and claim was preempted by LMRA).

Because resolution of Poole's claim for intentional infliction of emotional distress requires interpretation of the CBA and analysis of BN's procedures in light of the CBA, this claim is preempted by the RLA, and BN's motion for summary judgment shall be granted as to this claim.

### c. Invasion of Privacy Claim

Poole's final state claim is that BN invaded Poole's privacy by placing Poole before the public in a false light. Neb.Rev.Stat. § 20–204 (Michie 1995).

In support of its motion for summary judgment, BN argues that resolution of Poole's invasion of privacy claim, which is subject to the defense of privilege, requires interpretation of various provisions of the CBA—such as the provision which prohibits discharge without just cause, the grievance procedure provisions, and the provisions regarding written notice to employees and their union representatives about investigations and disciplinary actions—thereby making this claim preempted by the RLA. (Def.'s Br. Supp.Mot.Summ.J. at 25–27.)

Neb.Rev.Stat. § 20–204 (Michie 1995), the basis of Poole's claim, provides:

Any person, firm, or corporation which gives publicity to a matter concerning a natural person that places that person before the public in a false light is subject to liability for invasion of privacy, if:

(1) The false light in which the other was placed would be highly offensive to a reasonable person; and

(2) The actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

■ Essential to a claim of false light invasion of privacy is (1) the giving of publicity, which means that the "matter be communicated 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge,'" *Schoneweis v. Dando,* 231 Neb. 180, 185, 435 N.W.2d 666, 670 (1989) (quoting *Polin v. Dun & Bradstreet, Inc.*, 768 F.2d 1204, 1206 (10th Cir.1985) & Restatement (Second) of Torts § 652D); and (2) that the publicized matter be false, *Schoneweis,* 231 Neb. at 185–86, 435 N.W.2d at 670.

standard the Court employs in cases involving § 301 of the LMRA."

**5.** The preemption standard discussed in *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620 (8th Cir. 1989), is based on *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). The Supreme Court adopted the *Lingle* standard to resolve claims of RLA preemption in *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

Thus, the elements of false light invasion of privacy are: "(1) placing another in a false light (2) which would be highly offensive to a reasonable person and (3) that the actor had knowledge or acted in reckless disregard as to the falsity of the publicized matter." *Wadman v. State,* 1 Neb.App. 839, 848, 510 N.W.2d 426, 432 (1993).

In deciding whether resolution of a state law claim requires construing or interpreting a collective bargaining agreement for purposes of preemption analysis, probable defenses, as well as the claim itself, must be considered. *Luecke v. Schnucks Markets, Inc.,* 85 F.3d 356, 360 n. 4 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 517, 136 L.Ed.2d 405 (1996); *Johnson v. Anheuser Busch, Inc.,* 876 F.2d 620, 623 (8th Cir.1989). As to communications that are alleged to constitute an invasion of the statutory right of privacy created by Neb.Rev.Stat. § 20–204 (Michie 1995), such right of privacy is subject to "qualified or absolute privilege according to the law of defamation." Neb.Rev.Stat. § 20–206 (Michie 1995).

> "Generally, whether a publication is privileged is a question of law to be determined by the court.... A communication is privileged if made bona fide by one who has an interest in the subject matter to one who also has an interest in it or stands in such relation that it is a reasonable duty, or is proper, for the writer to give the information."

*Molt v. Lindsay Mfg. Co.,* 248 Neb. 81, 89, 532 N.W.2d 11, 17 (1995) (quoting *White v. Ardan, Inc.,* 230 Neb. 11, 19, 430 N.W.2d 27, 32–33 (1988)) (suit against former employer alleging that employer distributed libelous material and made slanderous statements regarding employee's termination to various personnel). When a qualified privilege exists, no recovery is possible without proof of malice, which must be established by proof that the publication was made with hate, spite, or ill will. *Id.* at 90–91, 532 N.W.2d 11, 532 N.W.2d at 18.

Poole alleges that BN invaded his privacy by placing him in a false light when BN alleged that Poole had alcohol on his breath while on company property, which was false, and then formally investigated Poole and dismissed him from BN's employment based on the same false allegation. (Filing 1, Complaint ¶ 86.) Poole also alleges that BN knew of the falsity of the published matter because BN "knew and could have confirmed that a urinalysis test for ethyl alcohol performed on plaintiff at 6:00 p.m., on April 24, 1995, at a certified laboratory, determined that plaintiff had 0.00 grams of alcohol per deciliter in his urine," and recklessly disregarded the falsity of the publicized matter by dismissing him from employment despite the negative urinalysis results. (Filing 1, Complaint ¶¶ 88, 89.)

Poole's evidence submitted in opposition to BN's motion for summary judgment establishes that (1) Poole recalls that "several individuals have indicated to [Poole] that they know [Poole was] terminated from BN employment because of a Rule 1.5 alcohol violation"; (2) Poole himself did not tell these unnamed individuals he was terminated for a Rule 1.5 violation; and (3) Poole "believe[s] BN has publicized [Poole's] termination for a Rule 1.5 alcohol violation to many others." (Filing 27, Aff. Timothy H. Poole, Ex. C ¶ 18.)

To resolve this claim, it is necessary in this case to determine whether (1) BN gave publicity (meaning communicated to the public at large or to so many that it was substantially certain to become a matter of public knowledge) (2) to BN's allegation and conclusion that Poole had alcohol on his breath while on BN property (3) that placed Poole before the public in a false light that would be highly offensive to a reasonable person (4) when BN knew of, or acted in reckless disregard as to, the falsity of the allegation and conclusion that Poole had alcohol on his breath while on BN property and the false light in which Poole would be placed.

On the record before me, resolution of each of these questions does not require reference to, or interpretation of, the collective bargaining agreement. The above questions are simply factual inquiries that have nothing to do with provisions of the CBA addressing discharge for just cause or the grievance procedure, as BN contends. *See, e.g., Luecke,* 85 F.3d at 359 (plaintiff's state defa-

mation action based on fellow employees' alleged publication of false statement that plaintiff refused to take drug test was not preempted by LMRA when central inquiry was factual—that is, what was said to whom, whether it was knowingly or recklessly false, and resulting damages—and did not require interpretation of the collective bargaining agreement).

BN's privilege defense must be analyzed by asking (1) whether the communication (BN's allegation and conclusion that Poole had alcohol on his breath while on BN property) was made by one who had an interest in the subject matter (2) to one (a) who also had an interest in the subject matter or (b) who stood in a position such that the communicator had a reasonable duty to give the information, or it was proper for the communicator to do so. If the answers to these questions result in the extension of a qualified privilege to BN, the final question is whether the publication was made with hate, spite, or ill will.

In the absence of evidence that the CBA in effect at the relevant time contained provisions regarding the confidentiality of Rule 1.5 disciplinary charges, investigation, and resulting disciplinary action, and in the absence of evidence of "some longstanding practice or custom from which to infer incorporation" of a confidentiality provision into the CBA, analysis of the qualified privilege defense does not require interpretation of the CBA. *Luecke*, 85 F.3d at 361–62. While one affidavit submitted by BN states that "[c]harges, investigation, and resulting disciplinary action are communicated only to the employee, his union representative, and management employees involved in the disciplinary process" and that "BN does not disclose disciplinary matters to other employees or to the public," there is no evidence that this is a longstanding BN practice, custom, or usage such that I can conclude that interpretation of such a confidentiality policy is necessary in order to determine that BN's allegation and conclusion that Poole had alcohol on his breath while on BN property was made by one who had an interest in the subject matter to one who was similarly interested or to whom the communicator had a reasonable

duty to give the information, or it was proper for the communicator to do so. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311, 109 S.Ct. 2477, 2484, 105 L.Ed.2d 250 (1989) (collective bargaining agreements contain implied and express terms; parties' practice, usage, and custom considered in interpreting such agreements); *Luecke*, 85 F.3d at 361–62 (court would not read confidentiality provision into CBA when there was no evidence that company's unilaterally adopted drug-testing policy was longstanding practice or custom from which to infer incorporation).

In sum, the inquiries involved in resolving Poole's false light invasion of privacy claim and BN's privilege defense are "purely factual question[s]" that do not require interpretation of the BN–UTU collective bargaining agreement for resolution, *Norris*, 512 U.S. at 261–62, 114 S.Ct. at 2248–49; *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882, and do not depend on duties, rights, or obligations created or defined by the CBA. *Norris*, 512 U.S. at 259, 114 S.Ct. at 2247. Therefore, Poole's false light invasion of privacy claim based on Neb.Rev.Stat. § 20–204 is not preempted by the RLA, and I shall deny BN's motion for summary judgment on forum preemption grounds as to this claim.

## C. Alcohol–Testing Statute Claim: Field Preemption and Applicability of Statute

### 1. Field Preemption

Poole also claims that BN violated the Nebraska alcohol- and drug-testing statute, Neb.Rev.Stat. § 48–1903, quoted above. In response, BN argues that the statute is preempted because Congress has occupied the field with respect to alcohol-testing requirements for railroad employees. *See* 49 C.F.R. Part 219 (Department of Transportation, Federal Railroad Administration, "Control of Alcohol and Drug Use") (1994). While BN explicitly admits that the regulations contained in 49 C.F.R. Part 219 "do not govern off-duty use of alcohol" and do not address employees who are under the influence of alcohol and enter company property, as is the situation in the case at bar, BN apparently argues, by citation to an Iowa

Supreme Court case, that the federal government has nevertheless occupied the field of regulation of drug- and alcohol-testing requirements for railroad employees by what is sometimes called negative or implicit preemption. (Def.'s Br.Supp.Def.'s Mot. Summ.J. at 28–33 (citing *Brotherhood of Maintenance of Way Employees v. Chicago & North Western Transp. Co.*, 514 N.W.2d 90 (Iowa), *cert. denied,* 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 129 (1994) (hereinafter *BMWE* ).))

In *BMWE*, maintenance-of-way railway employees and members of a maintenance-of-way railway employees' union argued they were entitled to the protections contained in a state statute that addressed drug testing of employees, and they had been illegally forced to submit to drug testing under railroad policies that were prohibited by that statute. In response to the employees' and union's argument that maintenance-of-way employees were exempt from the federal regulations, the court determined that the Secretary of Transportation's decision not to include such employees among those subject to federal alcohol- and drug-testing regulations evidenced "a discernible federal policy ... that employer testing of safety-sensitive railway employees is not to be restricted by local law." *BMWE*, 514 N.W.2d at 94. "Allowing the several states of the union to apply local law that is inconsistent with the Secretary's election not to restrict employer drug testing would frustrate the intent of Congress that the Secretary's decision is to be controlling." *Id.* Thus, the court affirmed the district court's dismissal on federal preemption grounds.

Based on BN's citation of *BMWE*, I construe BN's argument to be (1) that the Secretary of Transportation's failure to promulgate alcohol- and drug-testing procedures for off-duty railroad employees who are under the influence of alcohol and enter company property—when the Secretary has broad regulatory authority to do so and when the Secretary of Transportation has comprehensively regulated the field of railroad employee drug testing—evidences a determination under congressional authority that such regulation is not appropriate pursuant to federal or state authority, and (2) that, as a result, Neb.Rev.Stat. § 48–1903 is preempted by the Secretary's determination.

Poole argues that the Secretary's failure to promulgate such alcohol- and drug-testing procedures does not express Congress' "clear and manifest purpose" to preempt, especially when 49 U.S.C. § 20106 allows state regulation "related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement."

### a. Law

Congress has given the Secretary of Transportation the authority to "as necessary ... prescribe regulations ... for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970." 49 U.S.C. § 20103(a) (1997) (recodified from 45 U.S.C. § 431(a)(1)). Pursuant to this authority, the Secretary promulgated regulations governing "minimum Federal safety standards for control of alcohol and drug use" which were in effect at the time of the incident at issue in this case. 49 C.F.R. § 219.1(b) (1994).

Applicable to employees who have "been assigned to perform service subject to the Hours of Service Act (45 U.S.C. 61–64b) during a duty tour," 49 C.F.R. § 219.5, these regulations included provisions related to post-accident drug and alcohol testing, testing for cause, pre-employment testing, identification of "troubled" employees, random testing, and procedures and safeguards for such testing. 49 C.F.R. §§ 219.1 to 219.715 (1994). The regulations expressly did "not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent" with them, 49 C.F.R. § 219.1(b), and section 219.13 of the regulations provided that "issuance of these regulations preempts any State law, rule, regulation, order or standard covering the same subject matter, except a provision directed at a local hazard that is consistent with this part and that does not impose an undue burden on interstate commerce."

Congress has the power to preempt state law under the Supremacy Clause. U.S. Const. Art. VI, cl. 2. Pursuant to that pow-

er, and with regard to state regulations or laws which might address the same subject matter as that covered in regulations promulgated by the Secretary of Transportation in the railroad context, Congress has provided:

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (1997).

■■■ Of all the theories of preemption,[6] BN argues negative or implicit preemption due to the Secretary's failure to regulate alcohol testing for off-duty employees who enter railroad property when the Secretary of Transportation has comprehensively regulated the field of railroad employee drug testing, leaving no room for the states to supplement such regulation. "Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Public Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). *See also Hillsborough County v. Automated Medical Labo-*

*ratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) ("We have held repeatedly that state laws can be preempted by federal regulations as well as by federal statutes.").

The Supreme Court, as well as lower courts, have recognized what some courts have called negative or implicit preemption. *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983) ("a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *unregulated*, and in that event would have as much pre-emptive force as a decision *to* regulate") (emphasis in original); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1978) (" 'where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation") (quoting *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947)); *Norfolk & Western Ry. Co. v. Public Utilities Comm'n*, 926 F.2d 567, 570–71 (6th Cir.1991) (Federal Railroad Administration's (FRA) explicit refusal in FRA statement to adopt regulation requiring railroad bridge walkways was a determination that such regulation was not appropriate, thus amounting to negative preemption); *Burlington Northern R.R. Co. v. State of Minnesota*, 882 F.2d 1349, 1353–54 (8th Cir.1989) (in light of FRA's express statement in a FRA background report that it did not consider use of caboose to be a safety concern or to be necessary, FRA's failure to enact mandatory caboose requirement takes on character of ruling that no such regulation was appropri-

---

**6.** The Court in *Louisiana Public Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986), described several of these theories:

Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where

there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Id.* (internal citations omitted).

ate, thereby preempting Minnesota's mandatory caboose law as conflicting with FRA's implied ruling that such regulation was not appropriate); *Burlington Northern R.R. Co. v. State of Montana*, 880 F.2d 1104, 1106–07 (9th Cir.1989) (when FRA in course of rulemaking proceedings expressly rejected request to require use of occupied cabooses on trains, the FRA's actions preempted Montana law requiring occupied cabooses, as the FRA's rejection of caboose requirement reflected its judgment that such regulation was inappropriate and states could not secondguess that judgment); *Missouri Pacific R.R. Co. v. Railroad Comm'n of Texas*, 833 F.2d 570, 575–76 (5th Cir.1987) (in the absence of indication that the FRA failed to adopt regulation because it was unjustified, thereby taking on the character of a ruling that no such regulation was appropriate, court would not find that FRA intended to preempt state regulations); *Edwards v. Consolidated Rail Corp.*, 567 F.Supp. 1087, 1100–01 (D.D.C. 1983), *aff'd*, 733 F.2d 966 (D.C.Cir.), *cert. denied*, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984) (in case where plaintiff was injured by high-voltage catenary wires suspended above railroad tracks, court found that when no federal standard or regulation had been adopted pursuant to the Railroad Safety Act governing railroad catenary systems, and parties agreed that no federal regulations governed that subject matter, common-law duties of reasonable care were not preempted *sub silentio* by the federal power to regulate all aspects of railroad safety, stating "the mere existence of an unexercised power to preempt is not in itself preemptive of any local common law remedies that plaintiff may have in this case").

■■ When the "field" that arguably has been preempted by a federal agency acting pursuant to congressional delegation has been traditionally occupied by the states, as is the field of health and safety regulation, " 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Hillsborough County*, 471 U.S. at 715, 105 S.Ct. at 2376 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).

We are even more reluctant to infer preemption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

Moreover, because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to pre-empt. Given the presumption that state and local regulation related to matters of health and safety can normally coexist with federal regulations, we will seldom infer, solely from the comprehensiveness of federal regulations, an intent to pre-empt in its entirety a field related to health and safety.

*Hillsborough County*, 471 U.S. at 717–18, 105 S.Ct. at 2377–78 (internal citation omitted).

It is BN's burden to show implicit preemption of the whole field of alcohol and drug testing of railroad employees. *Hillsborough County*, 471 U.S. at 716, 105 S.Ct. at 2376; *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) (it was defendant's burden to show that Congress intended to preempt punitive damage awards when argument was that such awards were preempted by federal law).

### b. Analysis

■■ BN expressly admits that the Secretary's regulations in 49 C.F.R. Part 219 "do

not govern off-duty use of alcohol" and do not address employees who are under the influence of alcohol and enter company property, and therefore do not directly apply to the factual scenario at issue in this case. (Def.'s Br.Supp.Mot.Summ.J. at 30.) Rather, BN argues that the Secretary of Transportation's failure to promulgate alcohol- and drug-testing procedures for off-duty railroad employees who are under the influence of alcohol and enter company property—when the Secretary has broad regulatory authority to do so and when the Secretary of Transportation has comprehensively regulated the field of railroad employee drug and alcohol testing—evidences a determination under congressional authority that such regulation is not appropriate pursuant to state authority, and, therefore, Nebraska's alcohol- and drug-testing statute is preempted by the Secretary's determination.

After reviewing its evidence and brief submitted in support of its motion for summary judgment, I conclude that BN has not met its burden to show that Congress, through the Secretary of Transportation, intended to preempt state regulation outlining alcohol-testing procedures conceivably applicable to off-duty railroad employees who enter company property under the influence of alcohol. In support of its motion for summary judgment, BN fails to offer or point to any regulatory language, preambles, interpretive statements, or responses to comments on proposed regulations that would evidence a clear and manifest decision by the Secretary that state regulation in this specific factual situation was not appropriate and that would refute the possibility that the Secretary has simply not yet considered the matter.

In light of BN's failure to meet its burden to show that Congress had a clear and manifest intent to preempt state regulation outlining alcohol-testing procedures conceivably applicable to off-duty railroad employees who enter company property under the influence of alcohol, I cannot say that the Secretary of Transportation's failure to exercise the Secretary's full authority "takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute," such that the State of Nebraska

is not permitted to use its police power to enact such a regulation, *Ray v. Atlantic Richfield Co.*, 435 U.S. at 178, 98 S.Ct. at 1004.

This conclusion is supported by BN's admission that the regulations contained in 49 C.F.R. Part 219 do not apply to this case and the express preemption clauses contained in 49 U.S.C. § 20106 (state may continue in force laws related to railroad safety until the Secretary of Transportation prescribes a regulation "covering the subject matter of the State requirement") and 49 C.F.R. § 219.13 (1994) (regulations preempt any state law "covering the same subject matter").

This conclusion is also supported by *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 670–73, 113 S.Ct. 1732, 1740–42, 123 L.Ed.2d 387 (1993). In *CSX,* the Court found that state negligence law as it related to CSX's alleged failure to maintain adequate warning devices at a railroad crossing was not preempted by federal regulations governing installation of railroad warning devices when the preconditions for application of the regulations had not been met—that is, that federal funds participated in the installation of the warning devices. "Examination of these regulations demonstrates that, when they are applicable, state tort law is pre-empted. However, petitioner has failed to establish that the regulations apply to these cases, and hence we find respondent's grade crossing claim is not pre-empted." *Id.* at 670, 113 S.Ct. at 1740. *See also Elrod v. Burlington Northern R.R. Co.,* 68 F.3d 241 (8th Cir.1995) (citing *CSX* for proposition that when federal grade crossing regulations were inapplicable, state negligence law related to failure to install adequate warning devices was not preempted). Here, BN admits that 49 C.F.R. Part 219 does not apply to Poole's situation. As such, Poole's claim under Neb. Rev.Stat. § 48–1903 is not preempted under *CSX*

Thus, I must conclude that Neb.Rev.Stat. § 48–1903—as it applies to off-duty railroad employees who enter company property and are then subject to a "test ... on the body fluid or breath specimen" of the employee, as a result of which continued employment is denied or disciplinary or administrative ac-

tion is taken—is not preempted by the Secretary of Transportation's regulation of alcohol and drug testing of railroad employees, 49 C.F.R. Part 219 (1994).[7]

### 2. Applicability of Neb.Rev.Stat. § 48–1903

■ In the alternative, BN argues that the plain meaning of Neb.Rev.Stat. § 48–1903 establishes that the statute is inapplicable to this case because the statute only applies to situations in which an employer has conducted an alcohol or drug test of employees involving the use of instruments to analyze a specimen of breath or bodily fluids, and the statute merely sets standards by which an employer must operate if it elects to use analytical testing devices or instruments. (Def.'s Br.Supp.Mot.Summ.J. at 27.) Because no alcohol "testing" occurred in Poole's case, the statute is irrelevant, BN argues.

> [T]he action [to discharge Poole] was taken on the basis of the testimony of two railroad officers who perceived the smell of alcohol on Poole's breath while meeting with him on company property. Nothing in the statute prohibits an employer from taking action based upon subjective perceptions of management. This case is no different than if the officers had observed Poole staggering as he walked, heard him talking with slurred speech, or became aware of any other manifestation of alcohol use which can be perceived by human senses.

(Def.'s Br.Supp.Mot.Summ.J. at 27.)

Poole argues that the method by which the BN supervisors determined that Poole had alcohol on his breath was a "preliminary screening procedure" within the meaning of the statute, and this method therefore required confirmation by gas chromatography or a breath-testing device before BN discharged Poole, as required by section 48–1903. (Pl.'s Br. Opp'n Mot.Summ.J. at 25.)

"Unless such construction would be inconsistent with the manifest intent of the Legislature," the words and phrases used in Nebraska statutes are to be "construed and understood according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such peculiar and appropriate meaning." Neb.Rev.Stat. § 49–802 (Michie 1995). See also Koterzina v. Copple Chevrolet, Inc., 249 Neb. 158, 162–63, 542 N.W.2d 696, 700 (1996) (in determining the meaning of a statute, a court "must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself").

Considering section 48–1903 in its entirety in its plain, ordinary, and popular sense, I am persuaded by BN's argument that the statute, although not preempted, is inapplicable to Poole's case. As quoted in section II(B)(2)(a) above, Neb.Rev.Stat. § 48–1903 provides that "[a]ny results of any *test* performed on the *body fluid or breath specimen* of an employee, as directed by the employer, to determine the presence of drugs or alcohol shall not be used to deny any continued employment" unless "[a] positive finding of alcohol by *preliminary screening procedures* is subsequently confirmed by either" gas chromatography or a breath-testing device. (Emphasis added.)

"Test" in this context means "a procedure or reaction used to identify or characterize a substance or constituent" or "to examine or analyze (a substance) by the use of a reagent." *Webster's Third New International Dictionary* 2361–62 (1986). "Specimen" means "a portion of material for use in testing." *Id.* at 2187.

In this case, there was not "a portion of material" collected which was subject to "ex-

7. It is entirely possible that 49 C.F.R. Part 219 would preempt Neb.Rev.Stat. § 48–1903 as it applies to railroad employees who are covered by the alcohol- and drug-testing procedures set out in 49 C.F.R. Part 219 because the procedures in section 48–1903 may conflict with those specified in the federal regulations, and because section 48–1903 would "cover[ ] the same subject matter" as that in 49 C.F.R. Part 219. See 49 C.F.R. § 219.13 (1994); 49 U.S.C. § 20106.

amin[ation] or analy[sis]" in order "to identify or characterize a substance or constituent" such that BN's conclusion that Poole had alcohol on his breath could be considered a "positive finding of alcohol by preliminary screening procedures" to which the gas chromatography and breath-testing device confirmatory procedures in Neb.Rev.Stat. § 48–1903 were applicable. *Webster's Third New International Dictionary* at 2187 & 2361–62.

Therefore, "construed and understood according to the common and approved usage of the language," Neb.Rev.Stat. § 49–802, I conclude that Neb.Rev.Stat. § 48–1903 is inapplicable to Poole's case, and BN's summary judgment motion should be granted as to this claim.

### D. Merits of Emotional Distress and Invasion of Privacy Claims

Because I have already determined that BN's motion for summary judgment should be granted as to Poole's emotional distress claim on forum preemption grounds, I need not discuss BN's alternative argument that Plaintiff has failed to establish the elements of that claim.

▆ However, since I determined above that Poole's false light invasion of privacy claim is not preempted by the RLA, I shall address BN's motion for summary judgment on the merits of this claim. Using the summary judgment standards set forth in detail above, and keeping in mind my duty to view the facts in the light most favorable to Poole, the party opposing BN's summary judgment motion, I shall deny BN's motion for summary judgment on the merits, as Poole has created a genuine issue of material fact as to elements essential to his claim.

Specifically, Poole's affidavit states that (1) "several individuals" know of Poole's termination from BN for allegedly having alcohol on his breath while on BN property, Poole did not give this information to these individuals, and Poole believes that BN publicized his termination to "many others"; (2) "BN's allegation that [Poole] was under the influence of alcohol while on BN property is false" and "BN's allegation that [Poole] had alcohol on [his] breath while on BN property

is false"; and (3) Poole unilaterally went to a medical clinic and provided a urine sample at 6:00 p.m. on April 24, 1995, the same day two BN supervisors allegedly smelled alcohol on Poole's breath during the afternoon. (Filing 27, Aff. Timothy H. Poole, Ex. C ¶¶ 17–20.)

These statements contained in Poole's affidavit are sufficient to create a genuine issue of material fact as to (1) whether BN gave publicity to its allegation and conclusion that Poole had alcohol on his breath while on BN property (i.e., whether BN communicated this information to so many people that it was substantially certain to become a matter of public knowledge); (2) whether or not Poole actually had alcohol on his breath while on BN property such that any publicity BN gave to this information was false; and (3) whether BN knew of, or acted in reckless disregard as to, this falsity and the false light in which Poole would be placed. Regarding the latter element, because Poole has created a genuine issue of material fact as to the falsity of the information alleged to have been publicized by BN, he has also created a genuine issue of material fact as to BN's knowledge of that falsity.

Accordingly, I shall deny BN's motion for summary judgment on the merits as to Poole's false light invasion of privacy claim.

### III. CONCLUSION

While Poole's claim pursuant to Neb.Rev. Stat. § 48–1903 is not preempted on forum or field preemption grounds, the statute is inapplicable to this case because there was not "a portion of material" collected which was subject to "examin[ation] or analy[sis]" in order "to identify or characterize a substance or constituent" such that BN's conclusion that Poole had alcohol on his breath could be considered a "positive finding of alcohol by preliminary screening procedures" to which the gas chromatography and breath-testing device confirmatory procedures in Neb.Rev.Stat. § 48–1903 were applicable. *Webster's Third New International Dictionary* at 2187 & 2361–62. I shall therefore grant BN's motion for summary judgment as to this claim.

Poole's intentional infliction of emotional distress claim is preempted on forum preemption grounds since resolution of this claim requires interpretation of the collective bargaining agreement and analysis of BN's procedures in light of the collective bargaining agreement. Therefore, I shall grant BN's motion for summary judgment as to this claim as well.

Because Poole's false light invasion of privacy claim and BN's privilege defense do not require interpretation of the collective bargaining agreement for resolution, this claim is not preempted on forum preemption grounds. Further, because there is a genuine issue of material fact regarding essential elements of Poole's invasion of privacy claim, I shall deny BN's motion for summary judgment as to this claim.

Finally, because Poole concedes that he cannot prevail on his claim under the Nebraska Fair Employment Practice Act, Neb. Rev.Stat. §§ 48–1101 to –1125 (Michie 1995), I shall dismiss this claim.

IT IS ORDERED:

1. BN's motion for summary judgment (filing 13) is granted as to Plaintiff's claim under Neb.Rev.Stat. § 48–1903 (Michie 1995);

2. BN's motion for summary judgment (filing 13) is granted as to Plaintiff's intentional infliction of emotional distress claim;

3. BN's motion for summary judgment (filing 13) is denied as to Plaintiff's false light invasion of privacy claim, which is the only claim remaining in this case; and

4. Plaintiff's claim under the Nebraska Fair Employment Practice Act, Neb.Rev. Stat. §§ 48–1101 to –1125 (Michie 1995), is dismissed, as Plaintiff concedes that he cannot prevail on this claim.

